# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | |
|---|---|
| **Oscar Contreras,** ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | 1:21cv368 (AJT/WEF) |
| ) | |
| **Stacey A. Kinkaid,** *et al.*, ) | |
| **Defendants.** ) | |

## **MEMORANDUM OPINION**

Federal inmate Oscar Contreras initiated this civil action pursuant to 42 U.S.C. § 1983, alleging violations of his constitutional rights while he was detained at the Fairfax County Adult Detention Center ("ADC"). On March 23, 2022, the Court reviewed Plaintiff's amended complaint and dismissed all of but five defendants and two claims: 1) that he was denied due process when he was placed in administrative segregation by defendants Lieutenant Spindle, Lieutenant Loftie, and Margaret Gassert; and 2) he was subjected to unconstitutional conditions of confinement while detained at ADC by defendants Major Shabazz and Captain O'Neil. [Dkt. No. 23 at 14]. Defendant Spindle, Loftie, Shabazz, and O'Neil each waived service [Dkt. Nos. 25-27, 30], and efforts to serve defendant Gassert were unsuccessful. [Dkt. Nos. 28, 33, 42, 47].

The matter is presently before the Court on the remaining served defendants Spindle, Loftie, Shabazz, and O'Neil's motion for summary judgment [Dkt. Nos. 34-36]; and Plaintiff's cross-motion for partial summary judgment on the unlawful conditions of confinement claim. [Dkt. Nos. 51-52]. Plaintiff received the notice required by Local Rule 7(K) and *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975) [Dkt. No. 36], and he has responded by filing an Opposition to the Motion for Summary Judgment [Dkt. No. 38], and his partial motion for summary judgment, with a brief in support. [Dkt. Nos. 51-52]. On March 10, 2023, the Court notified plaintiff and all

remaining defendants that, pursuant to Federal Rule of Civil Procedure 56(f), they were each "GIVEN NOTICE" "that summary judgment may be entered for nonmovant Defendant Gassert on the grounds set forth in the other Defendants' pending Motion for Summary Judgment and accompanying memorandum." [Dkt. No. 54 at 2]. All parties were notified that if any "party wishes to rely on facts or evidence not already in the record, that party must submit such facts or evidence in the form of affidavits, declarations made under penalty of perjury, or other records, as necessary" within twenty-one days from the date the order was entered. [*Id.*]. Plaintiff was also specifically advised that summary judgment could be entered on behalf of defendant Gassert if he did not respond, he needed to identify any fact that he disagreed with relevant to his claim against defendant Gassert, and he could submit a brief in response as well. [*Id.*]. No further briefs submitted and the pending motions therefore are ripe for disposition. For the reasons that follow, defendants' motion for summary judgment must be granted, and the plaintiff's motion for partial summary judgment must be denied.

## I. Undisputed Facts

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Defendants, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56, set forth a statement of material facts that defendants contend are undisputed.[1] Accordingly, the following statement of uncontested facts is derived from a review of defendants' statement of undisputed facts, plaintiff's responses, and the record.

---

[1] The record of admissible evidence includes defendants' affidavits and exhibits. [Dkt. Nos. 35-1 through -20; 39-1; 53-1 through-3]. Portions of Plaintiff's exhibits that are properly admissible. *See Goodman v. Diggs*, 986 F.3d 493, 498-99 (4th Cir. 2021) (verified pleadings are the "equivalent of an affidavit"). The Court notes that portions of Plaintiff's submissions are, at best, speculation that: have no basis in fact; are hearsay or argumentative; unauthenticated documents; or not based upon personal knowledge. [Dkt. Nos. 1, 11, 52].

1.      On January 14, 2021, plaintiff, a federal pre-trial detainee, was booked into the ADC. [Dkt. No. 35-1]. He remained on pre-trial detainee status through July 13, 2021. [Dkt. No. 52 at 1]. Plaintiff was initially evaluated as "medium" security, because ADC was unaware of any prior "assaultive felony convictions," "escape history," or past or present institutional behavioral problems. [Dkt. No. 35-1]. The medium classification, however, was "overridden" because he was a "gang member," which was described as "association with the criminal street gang MS-13." [*Id.*; Dkt. No. 35-3].

2.      Although plaintiff states he informed ADC personnel he was no longer active in the MS-13 gang, Plaintiff admits to association with the criminal street gang MS-13, and required separation from all members of MS-13 and members of rival gangs. [Dkt. No. 35-2, 35-3].

3.      Due to COVID-19, plaintiff was quarantined when he first arrived at the ADC (January 14, 2021 through January 29, 2021) and each time he returned from court; otherwise, from January 14, 2021 through early March, he was placed in the general population. [Dkt. Nos. 35-3; 35-11].[2] While in quarantine (a total of 44 days), Plaintiff was allowed out of his cell, each day, for ten minutes; and was also out of his cell for showers three times per week for approximately ten minutes. [Dkt. Nos. 52 at 3, 5; 35-14].

4.      Plaintiff was free to move around, all day, for a period of five days (January 29 through February 3, 2021). [Dkt. No. 52 at 3]. Plaintiff's cell was 6′ x 8′, did not have a window, and contained a sink and a toilet. [*Id.* at 4-5].

---

[2] Plaintiff disputes the defendants' assertion he was in general population for this period of time because he was in quarantine after he met with a detective for fourteen days, beginning February 4, 2021, and he was in quarantine a second time after his return from a court appearance, beginning February 17, 2021. [Dkt. No. 38-1 at 3]. An inmate can still be classified as "general population" while he is in a temporary quarantine. The dispute, however, is not material to the claims. To be sure, the defendants admit Plaintiff was in quarantine on the two occasions noted by Plaintiff. [Dkt. No. 35-11].

3

5. On March 2, 2021, at the end of a quarantine period resulting from a court date, plaintiff submitted an Inmate Request Form to Classification detailing his concerns about a previous ADC housing assignment. Plaintiff stated he did not want to remain in general population and asked that he "be put in a pod with my people where I can fit in," and attached a document stating:

> Similar problems were taking place at another jail where the jail was being indifferent to my concerns and kept putting me in a pod with D.C. inmates and [M]uslim inmates who I had problems with and it didn't end well. (see attached document to this request form for more details) document attached herein (see pg. 12.)

[Dkt. No. 35-4; 53-1 at 1].[3]

6. Page 12 of the document Plaintiff attached to his Inmate Request Form was marked in a manner to draw attention to the following excerpt from what appears to be from a legal brief:

> Contreras' disciplinary problems persisted. Point in case: on July 13, 2019, surveillance cameras at Northern Neck captured Contreras and another inmate fighting with one another … During the altercation, Contreras, who could be seen holding an object in his hand, made stabbing motions at the other innate who, in order to escape Contreras, jumped off the top tier of the pod where the[y] were fighting… Responding officers found the other inmate lying in a pool of his own blood….

[Dkt. No. 35-5].

7. The reverse side of the document, page 11, included details of plaintiff's reclassification to Maximum Custody status at Northern Neck Regional Jail, based upon threats to "start assaulting staff" who were "going to catch some boiling hot water," and reference to other behavioral incidents including a physical altercation with an inmate, kicking a food tray,

---

[3] Plaintiff was placed in pod "4N4," a general population assignment on January 29, 2021. [Dkt. No. 52 at 3]. In his request for a different housing assignment on March 2, 2021, Plaintiff complained about being housed in pod 4N4 with "Muslims and D.C. inmates" and "to avoid unnecessary problems" he requested that he be placed in another pod and assigned a single cell. [Dkt. No. 35-4 at 2]. He referenced problems in another jail and attached a document that detailed his previous behavioral incidents at Northern Neck. It was the March 2, 2021 request that alerted the ADC personnel to Plaintiff's previous assaultive behavior, threats against officers, and attempted escape. [Dkt. No. 53-1].

4

destruction of a showerhead, a physical altercation with a correctional officer after the discovery of a weapon and a hole in the wall of his cell, planning an escape, and destroying a mattress. [Dkt. No. 35-5].

8. Upon receipt of plaintiff's Inmate Request Form, the ADC Classification Division sought additional information from the U.S. Marshal's Service because of his status as a federal prisoner. Classification also placed plaintiff in Administrative Segregation,[4] and served on him a Notification of Referral to Institutional Classification Committee ("ICC"), to "determine appropriate housing and suitable restrictions." [Dkt. No. 35-6].

9. An ICC Hearing was held on March 11, 2021 at plaintiff's cell, with ICC members Spindle, acting as Chairman, Loftis, and Gassert. Plaintiff presented evidence, which was summarized as follows:

> Inmate Contreras Aguilar stated he did not intend for the request form submitted to be threatening. He stated he was defending himself specific to the assault with a weapon and was later cleared to wrongdoing. He explained the event detailing his intent to throw boiling water on staff was taken out of context. He explained he complained regarding the extremely hot temperature of the shower water, the staff ignored him, and he responded by asking how they would like to be in boiling water. [He] expressed he felt as though he is being disciplined. The appeal process was explained to his understanding.

[Dkt. No. 35-7, 35-8].

10. The ICC recommended that plaintiff remain in administrative housing, with the added restrictions of a Two-Deputy Escort with Hand and Leg Restraints, and that plaintiff would

---

[4] Plaintiff disputes the phrase "Administrative Segregation" and insists he was in "solitary confinement." [Dkt. No. 38-2]. Plaintiff, however, uses the phrase Administrative Segregation and "Ad Seg" in his own affidavit. [Dkt. No. 38-1 at 3-7]. Plaintiff even equates Administrative Segregation and "solitary confinement." [*Id.* at 4]. To the extent he objects to Administrative Segregation, his objection is based upon his opinion and not fact.

not be able to attend programs, recreation, or have personal visitation. [Dkt. No. 35-8. 35-9, 35-10].[5]

11. Capt. O'Neil, Chief, C/D Confinement Branch, concurred with the ICC's recommendation.[6] Plaintiff received a copy of the notice and was informed of his right to appeal. [Dkt. No. 35-2].

12. On March 13, 2021, plaintiff submitted an appeal of the disposition. Major Shabazz, Commander Confinement Division, denied the appeal on March 26, 2021, and plaintiff was notified of his decision on March 28, 2021. Plaintiff was also informed that he was eligible to request another Formal ICC hearing on April 10, 2021, 30 days following the March 11 hearing. [Dkt. No. 35-1].[7]

---

[5] Plaintiff disputes this fact arguing that the decision was not "impartial." [Dkt. No. 38 at 2]. Plaintiff's "dispute" is no more than arguing the intent of the decision makers and is not based upon fact but instead on personal opinion. The basis of the decision is supported by several instances of violent behavior, threats, an attempt to escape, and destruction of property — all of which Plaintiff stated in his response were "undisputed." [Dkt. No. 38 at 1-2].

[6] Plaintiff again disputes the impartiality of the hearing, but ignores the detailed statement of reasons, which includes acts of violence and threats, as well as Plaintiff's previous MS-13 affiliation. Even if the statement of defendant Spindle were true, that he was a gang member and had filed numerous complaints since arriving at ADC, the statement does not establish impartiality. Spindle's statement is, in substantial part, cumulative of information acquired from other sources (Plaintiff's association with the MS-13 gang). *Superintendent, Massachusetts Correctional Institution v. Hill*, 472 U.S. 445, 456 (1985) ("The fundamental fairness guaranteed by the Due Process Clause does not require courts to set aside decisions of prison administrators that have *some* basis in fact.") (emphasis added). The statement is also consistent with the record which states that the ICC explained its decision to Plaintiff, and that was based in part on Plaintiff's association with MS-13. Further, Plaintiff was provided the opportunity to explain his actions and nothing in the record indicates his explanation was not considered by the ICC before it rendered its recommendation. There is also no indication that Spindle or any of ICC members "prejudged" Plaintiff's request to be moved. Indeed, there is no indication that Plaintiff raised his concerns in his appeal. Plaintiff's own exhibit establishes that an ICC hearing, before three non-defendants, was held on April 18, 2021 and that ICC panel recommended Plaintiff remain in Administrative Housing but reduced his other constraints and limitations. [Dkt. Nos. 11-1; 35-12].

[7] Plaintiff asserts he was in administrative segregation status for 129 days (March 4, 2021 through July 13, 2021). [Dkt. No. 52 at 4]. The defendants assert he was only in administrative segregation for 90 days but do not provide a basis for that assertion. The jail records indicate Plaintiff was placed in Administrative Housing on March 4, 2021. [Dkt. No. 35-6]. For purposes of this memorandum Opinion, the Court will assume he was in administrative segregation for 129 days. The recreation privileges, however, were restored on June 10, 2021, 97 days after Plaintiff was assigned to administrative segregation. [Dkt. No. 35-13 at 5]. A complicating factor in this regard are the restrictions imposed to prevent the spread of COVID-19, which included curtailing recreation for all inmates at the ADC. [Dkt. No. 35-14].

13. On April 16, 2021, plaintiff submitted an Inmate Request Form seeking review of his classification. Again, he received a Notification of Referral to the ICC, and a hearing was held on April 21, 2021. Plaintiff did not add anything to his request. The ICC recommended that plaintiff's restrictions be downgraded to a One-Deputy Escort with Hand Restraints, that he not be permitted to attend programs or recreation, but that personal visitation be restored. Capt. D. DeGeare, Chief, Classification/Records Branch concurred with the recommendation. Plaintiff refused a copy of the Notice of ICC Disposition. [Dkt. No. 35-12].

14. On May 27, 2021, plaintiff submitted an Inmate Request Form seeking review of his classification. He received a Notification of Referral to the ICC, and a hearing was held on June 20, 2021. The ICC recommended that Plaintiff remain in Administrative Housing, without any security restrictions or privilege suspensions, that the One-Deputy Escort with Hand Restraints be removed, and that plaintiff's program and recreation privileges be restored. Capt. DeGeare concurred with the recommendation. [Dkt. No. 35-13].

15. The jail log indicates Plaintiff had access to the telephone on eighteen different occasions between January 14, 2021 and July 12, 2021, and that he was frequently out of his cell for showers. [Dkt. No. 14 at 1]. Access to either of the phones evident in the pictures outside Plaintiff's cell would have allowed the Plaintiff to see out of the window. [Dkt. No. 53-3]. During this period of time, COVID-19 restrictions limited inmate recreation. [Dkt. No. 14 at 1].

16. While Plaintiff had no institutional infractions at the ADC, ADC considered him a security risk and subject to hand and leg restraints, which meant he was not eligible for recreation. Further, the ADC has dramatically restricted inmate recreation and programming during the past two years to prevent the spread of COVID-19 in the facility. [Dkt. Nos. 35-14 at 1; 35-16].

17.     Plaintiff had daily interaction with numerous members of the jail staff each day, if he chose to interact with them. The deputies made rounds twice per hour, inmate trustees served meals three times per day, medical and mental health personnel made daily rounds in his unit. [Dkt. No. 53 at 1-1, ¶ 7].[8]

18.     The average monthly temperature in the ADC's East Side, where plaintiff was housed in segregation, ranged between 69.3° F in February and 75.3° F in April, during the first six months of 2021; these averages were consistent with the other housing areas of the ADC during that time. [Dkt. No. 35-17].[9]

19.     According to the Virginia Department of Corrections ("VDOC") Jail Inspection Report dated December 2, 2021, the ADC satisfied Life, Health, Safety Standard 6VAC-40-116, Appropriate Lighting and Heating, which requires that "[h]eat shall be evenly distributed in all

---

[8] Plaintiff has also attached two unauthenticated documents to his brief in support of his motion of partial summary judgment that indicate he had at least two visits from a social worker. [Dkt. Nos. 52-2, 52-3]. The social worker noted on April 5, 2021 that Plaintiff was "[a]lert, oriented x 4. Speech was clear and spontaneous. Eye contact was appropriate. Appeared well-kempt. Affect WNL. Thought process coherent and goal-directed, content was reality-based. Insight and judgement fair. Denied hallucinations. No delusions expressed." [Dkt. No. 52-3]. Plaintiff indicated he was "anxious when thinking about his case," had "[t]rouble sleeping at night," but the social worker did not observe any mental health symptoms and noted Plaintiff did not "appear to be imminent danger to self or others." [*Id.*]. Plaintiff was not scheduled for any future appointments but was aware of how to contact the social worker if she was needed, and the report ends noting that there were "[n]o overt symptoms of psychosis were observed or reported. No reports of daily living skills appeared to be significantly impacted." [*Id.*]. The social worker spent approximately 25 minutes with the plaintiff.

A nurse checked on Plaintiff on May 23, 2021 after he complained of "dizziness/lightheadedness: from the heat. [Dkt. No. 35-20]. The nurse noted Plaintiff was "fine, medically." [*Id.*].

[9] Plaintiff "disputes" the statistics provided by the defendants based upon the fact that he "sweat" while in his cell, and that he felt lightheaded, weak, dizzy and his air vent was clogged and inoperable. Plaintiff also asserts to the best of his calculations the temperature was often around 95° F. Plaintiff did not share how he derived the "95° F" calculation but his speculation is not enough to disregard the specific measurements provided by the defendants. [Dkt. No. 38 at 3-4]. Plaintiff's assertions do not contradict the specific facts asserted by the defendants. To the contrary, the average outside temperatures for Washington-Dulles International Airport, which is 11 miles from Fairfax, were between 68°F and 88°F for the month of July 2021, which were the lowest and highest temperatures during July 2021. *See* Climate & Weather Averages in Fairfax, Virginia, USA, https://www.timeanddate.com/weather/usa/fairfax/climate, (last viewed April 21, 2023). *See Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989) ("most frequent use of judicial notice of ascertainable facts is in noticing the content of court records") (collecting cases); *see, e.g., Lynch v. Leis*, 382 F.3d 642, 647 & n.5 (6th Cir. 2004) (taking judicial notice of state court records available to public online).

rooms so that a temperature of no less than 65° F is maintained. Air conditioning or mechanical ventilation systems, such as electric fans shall be provided when the temperature exceeds 85° F." [Dkt. No. 35-18 at 15].

20.     The ADC, certified by the American Correctional Association ("ACA"), met the ACA's Airflow requirements in 2021. [Dkt. No. 35-19]. The readings indicate the temperatures within the range in the VDOC regulations and that the system was working correctly. [Dkt. No. No. 35-19].

21.     The pictures of the cell area establish that there is an open area that is approximately 3′ x 8′ in the cell, which Plaintiff alleges is 6′ x 8′, and there is a large window at the end of the hallway that allows sunlight into the hallway. The toilet and sink are not part of the 6′ x 8′ area. [Dkt. No. 53-3].

## II. Standard of Review

"When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." *Desmond v. PNGI Charles Town Gaming, LLC*, 630 F.3d 351, 354 (4th Cir. 2011). Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The party seeking summary judgment has the initial burden to show the absence of a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255. Parties asserting that a fact cannot be or is genuinely disputed must comply with the requirements of Fed. R. Civ. P. 56(c) and Local Civ. R. 56(B).

### III. Analysis

*A. Alleged Due Process Violation*

Plaintiff claims that defendants Spindle, Loftis and Gassert denied him due process in relation to the ICC hearing held on March 11, 2021. Specifically, Plaintiff alleges that after a two-minute hearing, he asked Spindle why he was being kept in Administrative Segregation. Spindle told him it was because he was "a gang member …" and because the "top people" at ADC were aware that Plaintiff had filed "complaints." [Dkt. No. 11, at ¶¶ 25, 50].[10] Plaintiff alleges that the defendants already had their minds made up and therefore were not impartial and biased. The minutes from the hearing do not include the alleged statements attributed to Spindle, and focus entirely on the extensive evidence of violent behavior, the attempted escape, and the threats of violence — all of which Plaintiff has not disputed. The appeal does not mention the alleged partiality or statement by Spindle, and focuses on the behavioral incidents at the Northern Neck jail, which the ADC was apparently unaware of when Plaintiff was transferred to ADC on January 14, 2021 as evident from the fact that the intake form indicates that Plaintiff has no history of "institutional behavior problems." [Dkt. No. 35-1].

In the disciplinary hearing context, "due process require[s] written notice to the inmate of the charges, an opportunity for the inmate to call witnesses and present documentary evidence in his defense, and a written statement by the fact finders of the evidence relied upon and the reasons for the disciplinary action." *Baker v. Lyles*, 904 F.2d 925, 929 (4th Cir. 1990) (citing *Wolff v. McDonnell*, 418 U.S. 539 (1974)). This Court has explained that:

---

[10] The amended Complaint also indicates through Plaintiff's use of an ellipsis that there was more to Spindle's statement than he included in the amended complaint. The summary of Plaintiff's behavioral issues, attempted escape and his previous gang affiliation were enough to establish that his placement in administrative segregation was not arbitrary, as punishment, and satisfied due process because there was significantly more than "some evidence" that supported the decision.

> A jail, however, may take "immediate preventive action" for security reasons and due process can be provided after the restriction has been imposed. *Dilworth[ v. Adams]*, 841 F.3d [246,] [] 255 [(4th Cir. 2016)]. 'Due process for administrative purposes can include "informal, non-adversary review of the information" supporting segregation, including submissions from the detainee, "within a reasonable time after confining him to administrative segregation." *Williamson*[ *v. Stirling*], 912 F.3d 154, 184 [(2018)].

*Greene v. Gregory*, No. 1:20cv522, 2021 U.S. Dist. LEXIS 58581, at *18 (E.D. Va. Mar. 26, 2021). The record establishes that the hearing at issue was an administrative hearing, not a disciplinary hearing and that Plaintiff was afforded notice of each ICC hearing; allowed to be present and was present; presented evidence at the March 11, 2021 hearing; was allowed to present evidence at subsequent ICC hearings; was provided with a written statement of reasons for each classification decision; was informed of and exercised his right to appeal the ICC decisions; and was notified of his right to ICC review every thirty days (which he exercised). Moreover, in *Hill*, the Court held that "due process [is] satisfied if some evidence supports the" the prison's decision and that "[t]he fundamental fairness guaranteed by the Due Process Clause does not require courts to set aside decisions of prison administrators that have some basis in fact." *Id*. at 456. It is evident from Plaintiff's record at Northern Neck, which he does not dispute, Plaintiff represented a clear security risk for any correctional institution and that previous record is substantially more than the "some evidence" standard established in *Hill*.

Regarding the alleged partiality, even in the disciplinary hearing context courts have recognized that "the degree of impartiality required of prison hearing officials does not rise to the level of that required of judges generally." *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989). Specifically,

> the requirement of an impartial tribunal prohibits only those officials who have a direct personal or otherwise substantial involvement, such as major participation in a judgmental or decision-making role, in the circumstances underlying the charge from sitting on the disciplinary body. This would normally include only those such as the charging and the investigating staff officers who were directly involved in

11

> the incident. It would not include those who are only tangentially affected by the alleged misconduct, such as prison officials who may have some administrative connection with such misconduct prior to hearings.

*Meyers v. Alldredge*, 492 F.2d 296, 306 (3d Cir. 1974).[11] In considering the impartiality of a hearing officer, the Supreme Court has held "that the requirements of due process are satisfied if some evidence supports the decision by the [hearing officer]." *Luna v. Pico*, 356 F.3d 481, 487-88 (2d Cir. 2004). Further, the inmate must demonstrate prejudice in connection with the alleged denial of due process by showing that it affected the outcome of the hearing. *See Clark v. Dannheim*, 590 F. Supp. 2d 426, 429 (W.D.N.Y. 2008) (citing *Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir. 1991)) (other citations omitted).

Here, Plaintiff was placed in administrative segregation on March 4, 2021, after submitting a request form to Classification expressing his concerns about a previous cell assignment (which was in general population) and attaching documents that referenced his involvement in numerous events at another correctional institution that raised security and safety concerns. The previous events included harming another inmate, attempted escape, and threatening staff. Plaintiff had also admitted his association with MS-13, a criminal street gang.[12] The ICC notified Plaintiff on March

---

[11] To ensure impartiality in the disciplinary process the Federal Bureau of Prisons regulations provide that "the DHO may not be the victim, witness, investigator or otherwise significantly involved in the incident." *Pelletier v. Warden, FCI Allenwood*, No. 3:16cv1099, 2018 U.S. Dist. LEXIS 6452, at *7 (M.D. Pa. Jan. 16, 2018) (citing 28 C.F.R. § 541.8(b).

[12] The security risk presented by Plaintiff was apparent and his placement in administrative segregation was "reasonably related to a legitimate governmental purpose" and "does not appear 'excessive.'" *Robles v. Prince George's Cty., Md.*, 302 F.3d 262, 269 (4th Cir. 2002) (citation omitted). "Legitimate nonpunitive governmental objectives include 'maintaining security and order' and 'operating the [detention facility] in a manageable fashion.'" *Pierce v. Cty. of Orange*, 526 F.3d 1190, 1205 (9th Cir. 2008). *See Beverati v. Smith*, 120 F.3d 500, 502-03 (4th Cir. 1997) (finding no liberty interest where plaintiffs were confined to administrative segregation based on prison official's belief that they posed a danger to institutional security); *see also McKune v. Lile*, 536 U.S. 24, 26 (2002) (observing that the "decision where to house inmates is at the core of prison administrators' expertise").

*See Franklin v. True*, No. 94-3484, 1996 U.S. App. LEXIS 2157, *5-6 (7th Cir. Jan. 30, 1996) (affirming dismissal of equal protection claim because "placing gang-members with a history of violence in non-punitive administrative segregation is consonant with the government's interest in maintaining order within the prison system"). *See also Baker v. Lyles*, 904 F.2d 925, 931-34 (4th Cir. 1990) ("modicum of evidence" that inmate was a security risk required to satisfy due process).

4, 2021 that the ICC would review his classification on March 11, 2021 "[t]o determine appropriate housing and suitable restrictions" because of events that were "determined to be serious safety and security concerns." [Dkt. No. 35-6]. Plaintiff was informed that he could be present, hear the testimony offered, call and cross-examine witnesses, cross-examine adverse witnesses, receive a copy of the written findings and recommendations within three days, and know the reasons for the ICC's decision.

At the ICC hearing, Plaintiff declined to have a staff member assist him or to present witnesses. Defendants Spindle, Loftis, and Gassert, the ICC panel members, conducted the hearing at Plaintiff's cell. Following the hearing, Spindle prepared the minutes and forwarded them to Capt. O'Neil, Chief of the Classification and Records Branch. The minutes included a summary of Plaintiff's testimony, set forth the ICC's recommendation, and indicated that the appeal process was explained to Plaintiff. That same day, O'Neill sent Plaintiff the disposition notice which detailed the reasons for and the specifics of the ICC's recommendation. Upon review, O'Neill concurred with the ICC's recommendation. Plaintiff was provided with a copy of the notification and again informed of his right to appeal. Plaintiff appealed the ICC's disposition, which defendant Shabazz upheld in a Memorandum to Plaintiff dated March 26, 2021.[13] Plaintiff was accorded the same due process with regard to the subsequent ICC hearings on April 21, 2021 and June 20, 2021.

The undisputed record establishes that even if Spindle had not been a member of the ICC on March 4, 2021, the result of the proceeding would not have been different. The undisputed

---

[13] Despite Plaintiff's complaint as to the length of the hearing, the law does not compel a lengthy hearing. *See Tyson v. Eagleton*, Case No. 6:06-1686-PMD-WMC, 2007 U.S. Dist. LEXIS 63982, at *4 n. 2 (D.S.C. Aug. 28, 2007) (denying due process claims associated with "brief," eight-minute long disciplinary hearing), *aff'd*, 268 F. App'x 261 (4th Cir. 2008); *see also Linsenby v. Thomas*, No. Case No. 5:14-2893-DCN-KDW, 2014 U.S. Dist. LEXIS 125993, at *2 (D.S.C. Aug. 11, 2014) (denying inmate's due process complaints about parole board hearing including that it "lasted only three minutes despite his having submitted extensive medical evidence and personal recommendations to the Parole Board, and that Defendants could not have adequately considered and applied the statutory criteria for parole consideration in his case."). Moreover, he has established no prejudice to support his complaint, or established that the result would have been different if the hearing was longer.

evidence establishes that Plaintiff had a violent institutional history that included physical assaults on another inmate, an altercation with a correctional officer, threats against correctional officers, destruction of property, and an attempt to escape—which was in addition to his admitted association as a gang member. There was clearly "some evidence" to support an administrative decision to assign Plaintiff to administrative segregation. The defendants' motion for summary judgment on this claim will be granted.

*B. Conditions of Confinement Claim*

Plaintiff also claims that defendants Shabazz and O'Neil subjected him to unconstitutional conditions of confinement related to his administrative segregation assignment in "a small 6 x 8 cell, with no window or natural light," that was "warm," and "with almost no air circulation." Plaintiff also claims he received no out-of-cell recreation time or "meaningful exercise." [Dkt. No. 52 at 7].[14] He admits there is TV in the dayroom, but claims "it is always turned off." [Dkt. No. 11 at ¶¶ 26-27, 44-45].

Claims challenging the conditions of confinement imposed on pre-trial detainees are examined under the Due Process Clause of the Fourteenth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 535, 537 n. 16 (1979); *Hill v. Nicodemus*, 979 F.2d 987, 990 (4th Cir. 1992). However, "the due process rights of a pretrial detainee are at least as great as the [E]ighth [A]mendment protections available to the convicted prisoner." *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988).

> In evaluating a challenged condition under the Fourteenth Amendment, the Court asks whether it amounts to "punishment." *Williamson v. Stirling*, 912 F.3d 154, 174 (4th Cir. 2018). In making that assessment, the Court may look to Eighth Amendment jurisprudence because "[t]he constitutional protections guaranteed to a pretrial detainee under the Fourteenth Amendment are co-extensive with those

---

[14] In his amended complaint Plaintiff alleges he had no "rec/exercise at all." [Dkt. No. 11 at 14]. It is apparent from the undisputed pictures of Plaintiff's cell that there was room in his cell to exercise if he so desired, and likely why he has qualified his assertion with "meaningful."

> provided to convicted prisoners by the Eighth Amendment." *Kovari v. Brevard Extraditions, LLC*, 461 F. Supp. 3d 353, 381 (W.D. Va. 2020) (internal quotation marks and citations omitted). A condition of confinement claim has two components: (1) whether Aguilar suffered an objectively serious deprivation of "the minimal civilized measure of life's necessities" (the objective component); and (2) whether the defendants acted with deliberate indifference to the inmate's health and safety (the subjective component). *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks and citation omitted).

*Aguilar v. Luna*, No. 1:19cv118, 2021 U.S. Dist. LEXIS 35793, at *14 (Feb. 25, 2021).

To establish that a particular condition or restriction of detention amounts to impermissible punishment, a detainee must show either an "expressed intent" to punish or a lack of a reasonable relationship "to a legitimate nonpunitive governmental objective, from which a punitive intent may be inferred." *Martin*, 849 F.2d at 870.

Under the objective prong, plaintiff must demonstrate that the deprivation complained of was extreme and amounted to more than the "routine discomfort" that is "part of the penalty that criminal offenders pay for their offenses against society." *Strickler v. Waters*, 989 F.2d 1375, 1380 n.3 (4th Cir. 1993). The subjective prong requires the inmate to demonstrate that prison officials acted at least with deliberate indifference toward his or her needs. *Farmer*, 511 U.S. at 834. This subjective prong requires more than negligent conduct; deliberate indifference exists when a prison official "knows of and disregards an excessive risk to inmate health or safety." *Id.* at 835-37 (establishing a subjective recklessness standard for prison condition cases). Further, "[i]f a prisoner has not suffered serious or significant physical or mental injury as a result of the challenged condition, he simply has not been subjected to cruel and unusual punishment within the meaning of the [Eighth] Amendment." *Id.* at 1381 (internal citation omitted). In addition, Plaintiff does not have a federally protected liberty interest in any particular housing or classification unless it exceeds the scope of his original sentence and imposes an atypical and significant hardship in relation to the ordinary incidents of prison life. *See Sandin v. Conner*, 515 U.S. 472 (1995).

15

"[C]hanges in a prisoner's location, variations of daily routine, changes in conditions of confinement (including administrative segregation) and the denial of privileges ... are necessarily functions of prison management that must be left to the broad discretion of prison administrators to enable them to manage prisons safely and efficiently." *Gaston v. Taylor*, 946 F.2d 340, 343 (4th Cir. 1991) (en banc).

Regarding his placement in administrative segregation, the ADC had legitimate security concerns based upon Plaintiff's admitted association with MS-13, his previous violent behavior at Northern Neck, his threats to correctional officers at Northern Neck, and his previous attempted escape. The status as being in administrative segregation began, temporarily, on March 4, 2021 after Plaintiff submitted his request to the ICC and became the decision of the ADC on March 11, 2021 after the hearing. [Dkt. No. 35-8]. The decision was upheld on appeal, and Plaintiff's custody classification was reviewed again on April 21, 2021 and his classification was unchanged. [Dkt. No. 35-12]. The ICC reviewed his classification on June 10, 2021, and the ICC reduced his restraints form two deputy to one-deputy escort and his program and recreation privileges were restored" on June 10, 2021. [Dkt. No. 35-13 at 5].[15] Thereafter, while Plaintiff may not have had access to recreation, it was due to COVID-19 restrictions rather than his assignment to administrative segregation. [Dkt. No. 35-14].

Plaintiff has not countered the evidence submitted by the defendants that address temperature and airflow with evidence and instead provides speculation and his opinion, asserting that his vent was clogged and his unsubstantiated estimates of his cell temperature. Plaintiff was made aware that he could have requested a change in cell assignment if his cell had a "maintenance

---

[15] On June 10, 2021, Capt. D. DeGeare concurred with the ICC's recommendation that plaintiff remain in administrative segregation, because of the need to separate him from MS-13 members and rival gang members; however, at that time, all security restrictions and privilege suspensions were lifted, his restraints were removed, and his program and recreation attendance privileges were restored. [Dkt. No. 35-13 at 4-5].

16

issue" but did not. [Dkt. No. 53-1 at 3]. The record also establishes his other conclusory claims have no merit as well. The photographs submitted by the defendants also demonstrate that there was a large window in the hallway outside Plaintiff's cell that provided substantial sunlight in that area. Further, it is clear that there was substantial opportunities for social interaction in Plaintiff' housing area because correctional officers made rounds twice every hour, trustee inmates served meals three times per day, and medical personnel made daily rounds as well. Plaintiff was out of his cell several times per week for showers, had frequent access to a telephone, and was transported for court proceedings as well. Plaintiff also had access to a social worker on at least two occasions. The record establishes that Plaintiff had numerous social stimuli if he had chosen to interact with the numerous persons in and out of his cell, as well as his numerous telephone calls over the three to four-month period.

In *Riddick v. Willett*, No. 3:15cv361, 2016 U.S. Dist. LEXIS 75963 (E.D. Va. June 10, 2016), this Court, Judge Spencer presiding, rejected a conditions of confinement claim similar to Plaintiff's where the inmate complained of being held in administrative segregation in a windowless cell.

> While such placement resulted in [the detainee] not being able to access recreation equipment, eat outside of his cell, and look out a window, "[r]estraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial." *Bell*, 441 U.S. at 540; *see also Phomphackdi v. Spartanburg Cty.*, No. 9:05-3084, 2007 U.S. Dist. LEXIS 19895, 2007 WL 858736, at *5 (D.S.C. Mar. 20, 2007) (concluding that plaintiff's eight-month stay in administrative segregation "was not a violation of his due process rights" because he "was segregated pursuant to a legitimate government interest protecting his and the other inmates' well-being"). Therefore, an intent to punish cannot be inferred. *See Martin*, 849 F.2d at 870 (citing *Bell*, 441 U.S. at 538).

*Riddick*, 2016 U.S. Dist. LEXIS 75963, *13-14. As noted, the security risk that Plaintiff presented was a legitimate concern that justified his placement in administrative segregation.

17

With regard to recreation, a "complete deprivation of exercise for an extended period of time violates the Eighth Amendment prohibitions against cruel and unusual punishment, *Mitchell v. Rice*, 954 F.2d 187, 191 (4th Cir. 1992). To determine whether a deprivation of outdoor exercise amounts to a sufficiently serious deprivation under the Eighth Amendment, "courts should consider the totality of the circumstances, including, but not limited to, the length of the deprivation, the availability of recreation within the cell, and whether the inmate suffered any ill health effects as a result of the deprivation." *Barndt v. Wenerowicz*, 698 F. App'x 673, 677 (3d Cir. 2017). The undisputed picture of Plaintiff's cell indicate that in-cell exercise was available to him if he had desired to exercise.

In any event, Plaintiff's loss of recreation privileges as a result of administrative segregation lasted for approximately 97 days, although his exercise opportunities were likely further restricted due to COVID-19 restrictions. [Dkt. No. 35-14]. *See Kesling v. Tewalt*, 476 F. Supp. 3d 1077, 1086-88 (D. Idaho 2020) (concluding that inmate-plaintiff's amended complaint failed to set forth a plausible Eighth Amendment claim when prison officials had developed and instituted policies to curb the spread of COVID-19); *see also Swain v. Junior*, 961 F.3d 1276, 1289 (11th Cir. 2020) ("We simply cannot conclude that, when faced with a perfect storm of a contagious virus and the space constraints inherent in a correctional facility, the defendants here acted unreasonably by 'doing their best'"). Plaintiff, despite being removed from ADC custody over eighteen months ago has not established that he has suffered any ill health affects due to the alleged lack of exercise.[16] Plaintiff alleges that the alleged lack of ventilation caused weakness,

---

[16] He has attached an unauthenticated affidavit dated July 15, 2020, well before he was in the ADC's custody, regarding mental health issues. [Dkt. No 52-4]. Even if authenticated, however, it only establishes Plaintiff had mental health issues well prior to being transferred to ADC custody. Additional unauthenticated records from a social worker, establish that Plaintiff had "[n]o overt symptoms of psychosis were observed or reported. No reports of daily living skills appeared to be significantly impacted." [Dkt. No. 52-3]. The unauthenticated records actually either refute Plaintiff's allegations or negate causation.

lightheadedness, dizzy spells, sweating, and he felt like he was suffocating. [Dkt. No. 11 at ¶ 26]. However, medical personnel responded to his complaint and found no evidence that he required medical assistance or intervention for any such problems. [Dkt. No. 35-20]. *See Aurel v. Twigg*, No. ELH15-1920, 2015 U.S. Dist. LEXIS 165540 (D. Md. Dec. 10, 2015) (holding inmate's medical record illustrated no real injury related to the alleged lack of adequate ventilation); *see also Brown v. Baker*, No. 7:07cv00574, 2008 U.S. Dist. LEXIS 333 (W.D. Va. Jan. 3, 2008) (where plaintiff complained that his cell was hot and had insufficient ventilation, which combined with his high blood pressure, caused him to get overheated and unable to breathe, the court found that housing the plaintiff in a hot and stuffy cell without windows was insufficient to state a conditions of confinement claim).

In addition, Plaintiff has not established a genuine issue of material fact as to whether the conditions he was subjected to were imposed with an express intent to punish him or were not reasonably related to a legitimate nonpunitive governmental objective. It is not atypical for inmates to be placed in administrative segregation pending an investigation or for monitoring in light of safety and security concerns.[17]

[intentionally left blank]

---

[17] Plaintiff does not dispute that his claims for injunctive relief are moot since he is no longer in ADC custody. *See Rendelman v. Rouse*, 569 F.3d 182, 186 (4th Cir. 2009) (holding prisoner's transfer or release from a particular prison "moots his claims for injunctive and declaratory relief with respect to his incarceration there"); *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) (holding transfer of prisoner moots his Eighth Amendment claims for injunctive and declaratory relief).

## IV. Conclusion

For the foregoing reasons, defendants' motion for summary judgment [Dkt. No. 34] must be granted, and Plaintiff's motion for partial summary judgment [Dkt. No. 51] must be denied. An appropriate order will issue alongside this memorandum opinion.

April 28, 2023
Alexandria, Virginia

_____
Anthony J. Trenga
Senior U.S. District Judge